The FRANKLIN LIFE INSURANCE COMPANY, a corporation, Individually and representatively on behalf of all holders of the 9.44% Cumulative Prior Preferred Stock of Commonwealth Edison Company, a corporation, Plaintiff,

v.

COMMONWEALTH EDISON COMPANY, a corporation, Defendant,

Teacher Retirement System of Texas, Intervenor.

No. S–Civ–72–37.

United States District Court,
S. D. Illinois, S. D.

May 19, 1978.

Frederick H. Stone and George Gillespie, Gillespie, Cadigan & Gillespie, Springfield, Ill., Alan R. Bromberg, Dallas, Tex., Bill Campbell, Bill Baker, Asst. Attys. Gen., State of Texas, Austin, Tex., for intervenors Teacher Retirement System of Texas.

Charles A. Bane, A. Daniel Feldman, Terry F. Moritz, Isham, Lincoln & Beale, Chicago, Ill., Hugh Graham III, Graham & Graham, Springfield, Ill., for defendant.

## MEMORANDUM ORDER

J. WALDO ACKERMAN, District Judge.

This action arises out of the issuance and subsequent redemption of one million shares of 9.44% Cumulative Prior Preferred Stock at a par value of $100 per share, by defendant Commonwealth Edison Company. Trial on the issue of liability has been had before the Court sitting without a jury and the points presented have been ably briefed and argued by the parties. This Memorandum Order shall incorporate within its text the Court's findings of fact and conclusions of law, pursuant to F.R.Civ.P. 52(a).

Plaintiff, Franklin Life Insurance Company, filed this action individually and as representative of the class of persons holding the stock on or after January 4, 1972. Subsequently, other class members including the Teacher Retirement System of Texas, were either granted leave to intervene or entered their appearance in this action through various counsel.

The action was certified as a class action under F.R.Civ.P. 23(b)(3). The class consisted of 5,828 shareholders of the Edison Stock as of January 4, 1972, and thereafter. Pursuant to the notice required, 1,317 shareholders filed a written election to be excluded from the class leaving 4,511 members of the plaintiff class. The Court's certifying order, consistent with F.R.Civ.P. 23(c)(1), was conditional, thus allowing the class to be modified or altered prior to a decision on the merits.

The claims of plaintiffs can be basically divided into two categories, those based on alleged violations of the Federal Securities Acts and those based on breach of contract theories. The real crux of the matter is whether the redemption provisions contained in the prospectus and the actions taken by defendant thereunder, can be said to have either breached defendant's contractual obligations or materially misled plaintiffs in violation of the Federal Securities Laws.

Plaintiffs, on the securities claims, allege violations of §§ 11 and 17 of the Securities Act of 1933, 15 U.S.C. § 77k, and 15 U.S.C. § 77q respectively, as well as Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. On the contract claims, plaintiffs assert first that defendant redeemed in violation of the redemption terms as set out in the prospectus and in Edison's Articles of Incorporation and since those terms constitute an agreement between Edison and each of its shareholders, Edison must respond in damages for breach of contract. Further, plaintiffs claim that defendant failed to sufficiently publicize actions taken which looked toward the redemption of the Stock in violation of its listing agreement with the New York Stock Exchange, which plaintiffs assert, gives rise to a third party beneficiary action on that contract.

While each of these claims will be examined in more detail, for the reasons stated below and on the evidence presented, I find judgment must be for defendant on all counts.

## I.

In general, the facts surrounding this litigation are not in dispute. On June 24, 1970, defendant sold through its underwriters, one million shares of its 9.44% Cumulative Prior Preferred Stock (hereinafter Stock) at the offering price of $100 per share. Plaintiff, Franklin Life Insurance Company, (hereinafter Franklin) purchased 25,000 shares of the Stock at the asking price on or about June 24, 1970. Intervenors, the Teacher Retirement System of Texas (hereinafter Texas Teachers) purchased 30,000 shares at the asking price and took delivery, under a delayed delivery agreement on May 4, 1971. Both Franklin and Texas Teachers examined the prospectus issued by defendant in conjunction with its stock issue and relied on that prospectus when purchasing the Stock.

At the time the Stock was issued, investment funds were in short supply and as a result preferred stock issues bore an uncharacteristically high rate of return. Because of this high rate of return and because of the Stock's redemption provisions, both Franklin and Texas Teachers purchased the Stock as a long-term investment.

Although defendant preferred to issue the Stock with a 9.25% dividend rate and a five year redemption restriction period, defendant was convinced through negotiations with its underwriters, primarily the First Boston Corporation, that a dividend rate of 9.44% and a ten year redemption restriction period were required for a successful stock issue. These terms were incorporated in the prospectus issued in connection with the sale of the Stock and in Edison's Articles of Incorporation.

The prospectus provided on page 1 that the Stock was:

[n]ot redeemable, directly or indirectly, prior to August 1, 1980, through certain refunding operations (See page 2).

On page 2 of the prospectus, the text of the redemption provision provided:

[p]rior to August 1, 1980, *none* of the shares of the 9.44% Prior Preferred Stock *may be redeemed through refunding, directly or indirectly, by or in anticipation of the incurring of any debt or the issuance of any shares of the Prior Preferred Stock or any other stock ranking prior to or on a parity with the Prior Preferred Stock, if such debt has an interest cost to the Company (as defined), or such shares have a dividend cost to the Company (as defined), less than the dividend cost to the Company of the 9.44% Prior Preferred Stock.* Subject to the foregoing, the 9.44% Prior Preferred Stock will be redeemable at the option of the Company as a whole at any time or in part from time to time at the following per share redemption prices: $110 if redeemed before August 1, 1980; $107 if redeemed on or after August 1, 1980, but before August 1, 1983; $104 if redeemed on or after August 1, 1983, but before August 1, 1986; and $101 if redeemed on or after August 1, 1986; in each case plus accrued and unpaid dividends, if any. (Emphasis added.)

The prospectus also contained a section entitled "Purpose of Issue and Construction Program" on pages 4 and 5. That section stated that the net proceeds from the sale of the Stock would be added to working capital for application in part toward repayment of short-term commercial paper and primarily for interim financing of the construction program. This section of the prospectus then described the construction program and stated that the program for the next five year period, 1970–74, "as now forecast, calls for electric plant expenditures of approximately $2,250,000,000." Of that amount, it was estimated that $1,150,000,000 would have to be raised through the sale of additional securities of the company.

Consistent with this construction forecast, Edison's long term debt increased from $1.849 billion at the end of 1971 to an amount in excess of $3 billion at the time of

trial. Each issue of long term debt made by Edison, subsequent to the year 1971, was at an interest cost to Edison of less than 9.44%. During 1972, Edison also incurred debt through the issuance of short-term promissory notes. Edison's short-term debt on January 1, 1972, was $140 million, while at the end of 1972, it was $258 million. All the short-term commercial paper was issued at an interest rate of less than 9.44%.

The mails and instrumentalities of interstate commerce were used in the sale of the Stock and the Stock was listed and traded on the New York, Midwest and Pacific Stock Exchanges after August 13, 1970, and until the redemption of the Stock.

At the time the Stock was issued, defendant believed that in accordance with the redemption terms, it could redeem the Stock from the proceeds of common stock or other junior security offerings without regard to its borrowing activities.

On February 2, 1971, Edison issued its proxy statement for the 1971 annual meeting. The shareholders at that annual meeting were requested to vote on two proposals pertinent here. The first was an amendment to Edison's Articles of Incorporation increasing the number of authorized shares of common stock from 60 million to 75 million shares, and the second sought to authorize the creation of a new class of preferred stock. At page 6 of the proxy statement defendant stated:

Also, it is anticipated that the new Preference Stock or additional Common Stock, or shares of both such classes, may in the future be sold to redeem or otherwise used to retire all or part of the 9.44% Series of Prior Preferred Stock. However, the Company has no definitive plans at the date of this proxy statement for issuance of additional equity securities.

At Edison's annual meeting on April 2, 1971, defendant's Vice-Chairman Gordon Corey was quoted in the report of the annual meeting as saying:

We were disappointed in the 9.44% dividend rate on the prior preferred stock we sold last August, but we expect to refund it when market conditions make it feasible to do so.

The report of the annual meeting also contained a statement of defendant's Chairman J. Harris Ward in response to a question from a stockholder, that Edison did not intend to issue common stock in the near future.

Throughout 1971 and until January 5, 1972, when the announcement of Edison's intent to redeem the stock appeared in the Wall Street Journal, the Stock was traded on the exchanges at prices continually above the $110 redemption price. Edison monitored the trading of the Stock on the exchanges and was aware of this fact. On January 4, 1972, the Stock was trading at $119.6875 per share. On January 5, 1972, after the announcement had appeared in the Wall Street Journal, the price of the Stock fell to $111.375, a value approximating the $110 redemption price plus accrued dividends. Those holding the Stock on January 4, 1972, suffered a loss of $8.3125 per share in the course of the market's normal reaction to Edison's plans to redeem the Stock.

On February 2, 1972, Edison, pursuant to the terms of a prospectus, offered common stock and warrants to the common stock holders of Edison. That offer was fully subscribed. Edison segregated the proceeds of the common stock and warrants offering and redeemed the Stock out of those proceeds on or about March 20, 1972, at the redemption price of $110 per share plus accrued interest.

## II.

Plaintiffs assert that both the original sale of the Stock and its subsequent redemption violated the cited securities laws. At the heart of plaintiffs' various claims is the assertion that the prospectus when read as a whole, and particularly the redemption provision, when read in conjunction with the construction forecast, led plaintiffs to believe that the Stock could not be redeemed for ten years, that is, prior to Au-

gust 1, 1980. The key to this interpretation of the prospectus, is the language in the redemption provisions which stated that prior to August 1, 1980, none of the shares of the Stock might be redeemed "through refunding, directly or indirectly, by or in anticipation of the incurring of any debt . . . ."

The bulk of plaintiffs' arguments on the securities law counts have been concerned with the alleged violation of Rule 10b–5. Since the elements of a claim under both §§ 11 and 17 of the 1933 Act have been interpreted to be either more restrictive or coterminous with the elements required under Rule 10b–5,[1] this opinion will be limited to the 10b–5 claim and the § 11 and § 17 claims governed by the result under 10b–5.

Rule 10b–5, promulgated by the Securities and Exchange Commission under authority granted in 15 U.S.C. § 78j(b), provides:

[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of a national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the sale or purchase of any security. 20 CFR § 240.10b–5.

Plaintiffs make two basic claims under Rule 10b–5. First, it is asserted that defendant omitted a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading. More specifically, plaintiffs assert that defendant's intent to redeem the stock with an issue of common stock and warrants when market conditions made it feasible to do so, and defendant's belief that the redemption provisions of the prospectus allowed such a redemption without regard to defendant's borrowing transactions, were omissions of material fact necessary, in order to make statements made, in light of the circumstances under which they were made, not misleading. Secondly, the plaintiffs urge that the redemption, in light of these omissions, must have been a device, scheme, or artifice to defraud.

A private plaintiff under Rule 10b–5, bears the burden of proving by a preponderance of the evidence that he was a purchaser or seller of the security;[2] that there was a misstatement, nondisclosure, or

---

1. Section 11 of the 1933 Act, 15 U.S.C. § 77k, provides civil liability for false registration statements. Section 11 however, has been interpreted generally as being limited to damages for purchasers at the original offering, thus excluding those members of the plaintiff class who purchased in a secondary market. See, *In Re Equity Funding Corp. of America Securities Litigation,* 416 F.Supp. 161, 186–88 (C.D.Calif. 1976): Further, at least the Securities and Exchange Commission believes that damages under Section 11 are not recoverable where plaintiff disposed of the security at a price in excess of the offering price. See, SEC Release # 45, 11 Fed.Reg. 10947 (Sept. 22, 1933).

Section 17 of the 1933 Act, 15 U.S.C. § 77q, provides that it shall be unlawful for any person in the offer or sale of any security to use any of the means or instrumentalities of interstate commerce to consummate a fraudulent transaction. This section is often pled in conjunction with claims under Rule 10b–5. Liability under Section 17 has been considered coterminous with liability under Rule 10b–5. *SEC v. Texas Gulf Sulphur,* 401 F.2d 833 at 867 (2nd Cir. 1968) (concurring opinion of Friendly, J.), and said to require a finding of scienter as in 10b–5 cases. *Sanders v. Nuveen & Co., Inc.,* 554 F.2d 790, 795–796. (7th Cir. 1977). Further, Section 17 contains no express provision for any civil remedy and thus such a remedy must be judicially implied. In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733 n. 6, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the United States Supreme Court reserved ruling on this precise issue, and I do not feel it necessary to reach it here.

2. *Blue Chip Stamps et al. v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

scheme to defraud;[3] that the non-disclosure or misstatement was of a material fact, i. e., a fact that a reasonable investor might have considered important in making his investment decision;[4] that there was reliance, that is, a causal relationship between the violation of the rule and the injury;[5] and that defendant acted with a mental state embracing an intent to deceive, manipulate, or defraud,[6] or alternatively that defendant recklessly misstated or omitted a material fact.[7]

■ In this case, under either of the transactions asserted as violations of Rule 10b–5, the issuance or redemption of the stock, the class of plaintiffs here, by definition, purchased and sold the stock. Further there was undisputed testimony that the omissions charged were material, and that being the case, reliance is to be presumed.[8] The crucial questions are whether there was a non-disclosure or a scheme to defraud and, if so, did defendant act with a mental state appropriate for the imposition of liability?

### A. STOCK ISSUE

Looking first at the time the Stock was issued, the "omissions" charged have relevance only in light of plaintiffs' interpretation of the redemption provision. Plaintiffs interpreted that portion of the redemption provision reading, "none of the shares of the 9.44% Prior Preferred Stock may be redeemed through refunding, directly or indirectly, by or in anticipation of the incurring of any debt . . . " as prohibiting any refunding so long as defendant was borrowing money at interest cost of less than 9.44%. Thus, from the time of issuance until August 1, 1980, plaintiffs believed redemption could not be accomplished so long as defendant was a "net borrower", that is, borrowing more money per year than it repaid. The construction forecast in the prospectus, when read with plaintiffs' interpretation of the redemption language, rendered the stock uncallable prior to August 1, 1980. The testimony has established, that had plaintiffs known either of defendant's intent to redeem when market conditions made it feasible or of defendant's belief that redemption could be accomplished out of the issuance of common stock prior to August 1, 1980, without regard to the debt incurred, they would not have purchased.

■ In order to establish an omission under Rule 10b–5, plaintiffs must show that defendant omitted a material fact necessary in order to make the statements made, in

3. *Santa Fe Industries, Inc., et al., v. Green, et al.,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

4. *Affiliated Ute Citizens v. U. S.,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

5. This element is presumed where a material omission is found. *Affiliated Ute Citizens v. U. S.,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *TSC Industries, Inc., v. Northway, Inc.,* 426 U.S. 438, 447, n. 9, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1975).

6. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

7. *Sunstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir. 1977). In this case the Seventh Circuit defined recklessness for 10b–5 purposes in the following manner:
   Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it. 553 F.2d 1033, 1045.
   Further, the Court of Appeals for the Seventh Circuit said of this definition that "the danger of misleading buyers must be actually known or so obvious that any reasonable man would be legally bound as knowing," *Sunstrand, supra,* at 1045, and that "[t]his is an objective test although the circumstances must be viewed in their contemporaneous configuration rather than in the blazing light of hindsight." *Sunstrand, supra,* at 1045, n. 19.
   Since *Sunstrand,* the Seventh Circuit has further defined the scope of recklessness saying:
   We believe "recklessness" in these circumstances comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence. We perceive it would be not just a difference in degree, but also in kind. *Sanders v. Nuveen & Co., Inc.,* 554 F.2d 790, 793 (7th Cir. 1977).

8. See note 5, supra.

the light of the circumstances under which they were made, not misleading. The material facts assertedly omitted here are not objective. They are subjective. What plaintiffs would require are statements of defendant's intent and of defendant's beliefs concerning the proper interpretation of the redemption provision. Whether the security laws are broad enough to require the disclosure of such facts is, in my mind, open to serious question.[9] Further, whether the language of the prospectus adequately disclosed these facts is another question on which I express no opinion.

Assuming, however, that the securities laws require this type of disclosure and that the prospectus did not adequately disclose these facts, the question remains whether the non-disclosure was done intentionally or recklessly or as part of a scheme or artifice to defraud.

An examination of the prospectus does not reveal any intent to mislead nor does it reveal any recklessness. The prospectus does not purport to link the construction forecast with the redemption terms. The summary of the redemption terms appearing on page 1 purports to limit defendant's right to redeem only through "certain refunding operations." The redemption provision, arguably, forbade refunding through the proceeds of a stock issue, only if that stock ranked prior to or on a parity with the stock here in question and at an effective cost to the company of less than 9.44%.

There was no evidence that defendant was aware of any "net borrower" theory. Nor was there any evidence that redemption of a preferred stock issue through the proceeds of a common stock issue had ever been thwarted by language similar to "directly, indirectly, by or in anticipation of any debt,"—when coupled with increasing debt.

Defendant's witness Edward Lebens, a former Vice-President and Director of the underwriting First Boston Corporation, testified that the genesis of the "directly, indirectly, by or in anticipation of any debt" language grew out of a situation in the 1930's and 40's where corporations would issue bonds at a given rate of interest and within a very short period of time, refinance that issue with a subsequent issue at a lower rate. The language, Mr. Lebens testified, was designed to prevent this type of redemption, but not to prevent the redemption out of an issue of common stock. Further, the various prospecti concerning the issue of other utility preferred stock establish conclusively that although the language in the prospectus here at issue may be slightly different, it is not aberrational. The fact that Edison used similar language in a 1957 preferred stock issue which in turn, was redeemed in 1962, is entitled to some weight even though the conditions of that redemption varied greatly from those here under consideration.

■ Under these circumstances, the evidence fails to support a finding that defendant either intentionally or recklessly, failed to disclose a material fact necessary, to make the statements made not misleading. The evidence fails to support a finding of scienter. Therefore, there can be no securities law violation surrounding the issuance of the stock and judgment must be for defendant.

### B. REDEMPTION

Edison's redemption is asserted to give rise to liability under Rule 10b–5 in two ways. It is argued first, as the capstone of an Edison scheme to defraud purchasers of the Stock and second, as a breach of the duty, under Rule 10b–5, to continually inform the market of material information. Under both theories, the gravamen of the complaint is defendant's failure to reveal its belief in its right to redeem out of common

**9.** The thing misrepresented or not disclosed must be material information, which perhaps includes something more than firm fact, but does not include opinion or interpretation. Blomberg, Alan R., Securities Law, Vol. 3, p. 197 (1977).

stock and its intent to do so when market conditions made it feasible.

These omissions are subject to the same questions raised and reserved in Part I.A. above. Because I held in that section of the opinion, that no finding of scienter could be made, no finding of a scheme to defraud existing from issuance through redemption can be made.

However, another factor is added to that analysis in plaintiff's argument here. That factor is the assertion that Edison, at some point, through its monitoring of the market, must have known that the market did not interpret the redemption provisions as did defendant. The argument is premised on two points. First, that the current market price is an accurate indicator of the market's knowledge about the stock, including its redemption provisions, and secondly, that no reasonable investor knowing Edison's belief in its right to redeem and its intent to do so when market conditions made it feasible, would purchase at a price in excess of the redemption price.

It would appear to me, however, that there may be a number of reasons for a reasonable investor purchasing at a cost in excess of the redemption price knowing full well Edison's beliefs and intent, e. g., the investor might believe Edison incapable of issuing common stock. Be that as it may, if the premise is accepted, a solid argument for scienter can be constructed since at some point, Edison had to know that the market was unaware of Edison's belief in its right to redeem and intent to do so when feasible.

Once this knowledge was in Edison's hands, subsequent purchasers of the Stock could seek to establish liability based on reckless failure to disclose material infor-mation. Further, the original purchasers could benefit from the argument that although scienter was absent at the time of issue, in light of the subsequently acquired knowledge nondisclosure might indicate development of a scheme to defraud.

The answer to both theories is the same. Although the original prospectus may have failed to adequately disclose Edison's belief and intentions, a question I expressly reserved earlier, there are subsequent disclosures here, the February 25, 1971, proxy statement and the statements made at the annual meeting and contained in Edison's Report of Annual Meeting. If those statements adequately disclose defendant's beliefs and intentions, there can be no recovery on either of these theories.[10] As Justice White said:

> . . . the Court repeatedly has described the "fundamental purpose" of the Act as implementing a "philosophy of full disclosure"; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute.[11]

The pertinent portions of the proxy statement and the report of the annual meeting have been quoted earlier. *See*, p. 606, *supra*. The statements of Edison in those documents clearly reveal Edison's belief in its right to redeem and its intent to do so when market conditions made such a redemption feasible. The only question is the adequacy of the disclosure.[12]

Defendant's witness Jerry Quilty testified that all of defendant's 190,000 shareholders, including both individuals and institutions, received a copy of the February 25, 1971, proxy statement. Mr. Quilty also testified that each shareholder and 1,134

---

10. Plaintiffs emphasize that the redemption was in reckless disregard for the rights of its shareholders. The rights of the shareholders under the redemption provision appears to me to be a question of contract and will be discussed in Part III infra. Further, this theory does not appear to place the charged omissions and the necessary mental state in the same time frame. Suffice to say, if there was adequate disclosure of the omissions asserted, a 10b–5 action premised on the redemption itself will not lie.

11. *Santa Fe Industries, Inc.*, supra 430 U.S. n. 3 at 477–78, 97 S.Ct. at 1303.

12. This question recurs in plaintiffs' third party beneficiary theory and is discussed again in Part III.A. infra.

analysts and brokers received copies of the report of the 1971 annual meeting. Further, Mr. Quilty testified that both the proxy statement and the report of the annual meeting were circulated to a media list containing 260 newspapers and other public information services including the Wall Street Journal, the New York Times, and the Associated Press Wire Service.

Other testimony from plaintiffs' own witnesses establishes that defendant's belief and intent were broadly disseminated prior to redemption. Both Mr. Lobb and Mr. Pruitt of Texas Teachers testified that Texas Teachers had information from the market place and from the brokerage house of Merrill, Lynch, Pierce, Fenner & Smith, that defendant might redeem the stock. Mr. Parker, of the Duff & Phelps firm, also testified that he had heard information in the market place pertaining to the statement contained in defendant's proxy statement and the report of its annual meeting.

Under these circumstances the evidence establishes that there was adequate disclosure of defendant's belief that it could legally redeem and of its intention to redeem when market conditions made it feasible through the February 25 proxy statement and the 1971 report of its annual meeting. Those disclosures thwart any claims based on a breach on the continuing duty to disclose material information, and provide no evidentiary support for the asserted scheme to defraud.

The evidence fails to support any finding of liability on any of the claims asserted under Rule 10b–5. Therefore in accord with the analysis above, judgment must be for defendant and against plaintiffs on all the federal securities claims.

### III.

Along with theories asserting securities law violations, plaintiffs have two pendant claims based on breach of contract. Plaintiffs' first theory is that they are third party beneficiaries of a contract, the New York Stock Exchange listing agreement, between defendant and the New York Stock Exchange. Plaintiffs' second theory is that the redemption provision constituted a contract between Edison and its stockholders and that the redemption violated that contract since it was " . . . directly, indirectly, by or in anticipation of debt." Each of these theories of liability will be discussed more fully below.

### A. NYSE LISTING AGREEMENT

In order for a stock to be listed on the New York Stock Exchange, the issuer must enter into a "listing agreement" with the Exchange. Although the agreement in this instance has not been produced, it must be assumed that such an agreement was executed since it is undisputed that the Stock was listed on the New York Stock Exchange.

The listing agreement is said to be not only for the benefit of the parties—Edison and the Exchange—but also specifically for the benefit of the investing public. Plaintiffs claim therefore that since the benefits accruing to the investing public were specifically contemplated by the parties to the agreement, damages may flow to plaintiffs as third party beneficiaries for any breach of that agreement. The breach asserted is that the publication surrounding the 1971 proxy statement and the 1971 annual meeting was insufficient under the listing agreement.

Although the evidence fails to support a finding of any "plan" to redeem as of April 2, 1977—as opposed to the clearly established intent to redeem "when market conditions made it feasible"—plaintiffs allege that the increase in the number of authorized shares of common stock was corporate action which "looked toward" redemption. The increase in the number of authorized shares of common was proposed in the proxy statement of February 25, 1971, and approved at the April 1971 annual meeting.

Plaintiffs argue that under Section A10 of the New York Stock Exchange Company Manual,[13] a general news release [14]

> . . . shall be made as soon as possible after corporate action which will lead to, or which looks toward, redemption is taken. *Van Gemert, supra* n. 13 at 1376.

Thus, plaintiffs reason that the increase in the authorized shares of common stock was a corporate action "looking toward" redemption and that defendant failed to issue a general news release.

In *Van Gemert,* plaintiffs were a class of debenture holders who held the right to convert the debentures to common stock prior to redemption. Members of the class failed to convert their debentures to common stock assertedly because of inadequate notice of the redemption.

Plaintiffs here advance two theories which were also asserted by the plaintiffs in *Van Gemert.* Plaintiffs assert that they were third party beneficiaries under the NYSE listing agreement and that the terms under which the defendants accomplished redemption constituted a contract of adhesion which should not be enforced.[15]

Although the author of the *Van Gemert* opinion, Circuit Judge Oakes, indicated that he would base his finding of liability on the third party beneficiary theory,[16] the majority of the panel found defendant's liability arose from a failure to provide debenture holders with fair and reasonable notice of redemption and failure to adequately apprise the debenture holders of what notice of redemption they could expect.[17] The majority found that the duty to adequately apprise the debenture holders of the manner in which a notice of redemption could be expected arose out of the "contract between Boeing and the debenture holders, pursuant to which Boeing was exercising its right to redeem the debentures." [18]

While I, like Judge Oakes in *Van Gemert,* find the listing agreement theory attractive, there are a number of hurdles which plaintiffs fail to overcome.

■ In order to establish Edison's liability on this theory, I believe plaintiffs must establish that: (1) the listing agreement vests third party beneficiary rights in plaintiffs; (2) that Section A10 is incorporated into the listing agreement; (3) that the "looking toward" language of Section A10 requires a general press release in the case of the type of tentative corporate action taken here; and (4) that such a release was not made. Although a number of the links in this chain are weak, I believe that the fourth link—the showing that such a release was not made—is missing entirely.

The testimony of Mr. Quilty, discussed earlier,[19] is uncontroverted and establishes that a general news release was made. The fact that the release contained other corporate data and was not shown to have actually been published would not appear to constitute a breach of the requirements of Section A10.

## B. BREACH OF SHAREHOLDERS CONTRACT

The final question presented is the very heart of the litigation. Plaintiffs argue

---

**13.** It should be noted that neither the NYSE Company Manual nor the listing agreement which the Manual is purported to interpret are before the Court. But by stipulation of counsel, the pertinent provisions of both, as found in *Van Gemert v. Boeing,* 520 F.2d 1373 (2nd Cir. 1975) cert. den. 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), on damages 553 F.2d 812 (2nd Cir. 1977), are applicable to the case at bar.

**14.** Defined as a release to:
One or more newspapers of general circulation in New York City, which regularly publish financial news, or to one or more of the national news-wire services (Associated Press, United Press International), in addition to such other release as the company may elect to make. *Van Gemert, supra,* n. 13, at 1376–1377.

**15.** This latter theory is discussed in more detail infra.

**16.** See, 520 F.2d 1373, 1382 n. 19.

**17.** Id. at 1383–1386.

**18.** Id. at 1383.

**19.** See, pages 610–611, supra.

that Edison, in violation of its contract with plaintiffs, "redeemed through refunding, directly or indirectly, by or in anticipation of the incurring of any debt" at an interest cost of less than 9.44%.

■ It is unquestioned that the redemption terms of preferred stock issues create a contract between the corporation and its stockholders. See, *Tennant v. Epstein,* 356 Ill. 26, 33, 186 N.E. 864 (1934); *Kern v. Chicago & Eastern RR Co.,* 6 Ill.App.3d 247, 250, 285 N.E.2d 501 (1st Dist. 1972); and 11 *Fletcher Cyc Corp.* (per. ed.), ch. 58, §§ 5295, 5309 (1971 revised volume). Further, there is no dispute surrounding the relevant facts. Edison redeemed the Stock directly out of an issue of common stock and warrants at a time when its need for financing, to continue the construction program, was apparent. It is undisputed that the needed funds were available at an interest cost of less than 9.44%.

The question presented is purely one of contract construction. Does the "directly or indirectly, by or in anticipation" language permit redemption out of the proceeds of an issue of common stock and warrants regardless of Edison's borrowing projections?

The first step in the construction of any contract is to examine and interpret the language. The redemption provision is quoted in full on page 605, *supra.* The key provision provides that prior to August 1, 1980, none of the Stock:

> . . . may be redeemed through refunding, directly or indirectly, by or in anticipation of the incurring of any debt or the issuance of any shares of the Prior Preferred Stock or any other stock ranking prior to or on a parity with the Prior Preferred Stock, if such debt had an interest cost to the Company (as defined) or such shares have a dividend cost to the Company (as defined), less than the dividend cost to the Company of the 9.44% Prior Preferred Stock.

Each of the parties has presented a number of principles of contract construction urged as controlling under the circumstances. Each will be examined below. But it should be noted that the general goal of the contract construction—determining the intent of the parties and giving it effect—is difficult to achieve here because the contract was not one formed through negotiations between two parties. Edison drafted the provisions and offered the stock for sale to the general public. There was no contact between the parties concerning the terms of the redemption provision, although there were negotiations between Edison and its principal underwriter, First Boston Corporation concerning the redemption provisions.

In any event, the evidence shows that from the beginning, Edison believed that the redemption provisions gave it the right to redeem out of the proceeds of an issue of common stock at any time. On the other hand, the evidence also establishes that a number of the members of the plaintiff class, including the class representatives, believed that Edison had no right, under the redemption provision, to redeem in any manner so long as Edison could foresee that money would have to be borrowed at an interest cost of less than 9.44% for its construction program.

Edison makes a number of arguments in support of its position. First, that the clear meaning of the provision allows the actions taken here. The argument is based on the use of the word "refunding". Since the redemption provision provides that none of the stock:

> . . . may be redeemed through *refunding* directly, indirectly, by or in anticipation of any debt . . . (Emphasis added.)

and since common stock is part of the permanent capital of the corporation and cannot be refunded, refunding through an issue of common stock is permissible. Edison argues that a redemption directly out of an issue of common stock cannot be indirectly by or in anticipation of debt since the refunding operation necessarily must terminate with the issue of common.

This argument does not take into account the broad reading of "anticipation" argued

for by plaintiffs. They read "anticipation" as an ordinary word used in its ordinary sense. There is no technical use in the trade meaning for anticipation, they assert. The generally accepted meaning of anticipate is the equivalent of forecast or foresee. Thus plaintiffs argue that the redemption terms forbid redemption even out of common stock, at a time when Edison forecast borrowing money at an interest rate of less than 9.44%, the precise factual situation here.

Were it not for "refunding", plaintiffs' argument would be persuasive. However, there appears to me to be a logical distinction between redemption in anticipation of debt and redemption through refunding in anticipation of debt.

The actions of Edison as shown by the evidence, could be characterized as redemption in anʲ ʾpation of debt since it well knew its ⌐. ⌐ncing needs and that in the current market those needs could be met at a cost of less than 9.44%. If the redemption clause requires an examination of the entire borrowing activities of Edison then plaintiffs should prevail.

However, I believe that the clause forbidding redemption through refunding by or in anticipation of debt, requires an examination of only the source of the funds actually used to achieve the redemption. Were the proceeds of the issue of common stock and warrants in anticipation of debt at an interest cost of less than 9.44%? The answer must be no. Common stock cannot be refunded.

The concepts are illusive but perhaps the interpretations of plaintiffs and defendant can be contrasted with a simple example. Were a man to borrow $1,000 from the bank in order to start a small business, the bank might well place a provision in the loan agreement forbidding the borrower from repaying the $1,000 from funds derived in any manner out of the funds borrowed at a lower interest rate.

Plaintiffs would argue that this agreement would preclude the borrower from taking on a partner for $1,000 and using that $1,000 to repay the bank loan when the borrower knew that within a short period of time the borrower and his new partner were going to borrow $20,000 for expansion of the business. Edison on the other hand would contend that so long as the $1,000 used to repay the bank was in no way derived from funds borrowed at a lower interest rate the plans of the partnership for expansion are irrelevant. The question would be whether the agreement controlled the source of the funds used to repay the loan or the borrowing activities of the borrower entirely. Certainly the borrower in the example could repay out of the proceeds of a sale of a ½ interest in the business and still be planning to borrow $20,000 to buy himself a yacht.

In each case the borrower anticipates borrowing funds. But in neither case does he anticipate borrowing funds to replace the capital advanced by the bank. If he anticipates borrowing to buy himself a yacht, clearly the $1,000 is in no way affected. And likewise, although it can be argued that he would have been wiser to save the $1,000 invested by his new partner and thus borrow only $19,000 for business expansion, the $1,000 used to repay the bank has no real connection with his expansion plans. He did not agree to remain in debt to the bank as long as he was going to be in debt to anyone. He merely promised to repay the borrowed funds out of capital derived in a manner other than through new debt.

The question in this case is the same. Does the redemption provision control the source of the funds used to supply the $110 million necessary for redemption or does it forbid redemption so long as it could be foreseen that funds would have to be borrowed to complete Edison's construction plans? Unless the provision seeks to control only the source of the repayment fund, the word refunding has no meaning.

When the word refunding is given meaning, the question of borrowing by or in anticipation of debt is narrowed from corporate borrowings in general, to the funds and the methodology used to replace the $100 million dollars raised by the preferred stock issue. Thus, whether the corporation

as a whole was "in anticipation of debt" is not the issue. The question is whether the redemption itself, was in anticipation of debt. Where did the money used to redeem the preferred stock come from and was that source in anticipation of debt?

This is the only construction which gives meaning to both the words, "redeem" and "refunding". Plaintiffs use redeem and refund interchangeably. But there is a difference between redemption by or in anticipation of debt and "redeem *through refunding* by or in anticipation of debt".

This interpretation is bolstered by two other provisions of the prospectus. On page 1 of the prospectus, it is provided that the Stock is not redeemable prior to August 1, 1980, directly or indirectly "through certain refunding operations." Further, in the redemption clause itself, $110 ($10 premium over purchase price) is set as the redemption price if redeemed prior to August 1, 1980.

These provisions can only be interpreted as showing that Edison considered redemption a real possibility. They further show that the language is intended to restrict the scope of the "refunding operations" and only by limiting refunding operations, place limits on redemption. The method used to redeem cannot be in anticipation of debt but the corporation itself may be, under the language. Use of the words "refunding operation" points up the difference between "refund" and "redeem".

The interpretation plaintiffs seek would allow redemption prior to 1980 only in two very unlikely circumstances: out of funds with an interest cost in excess of 9.44% or out of any fund so long as the construction plans were scrapped and no funds were to be borrowed. Given economic reality, no corporation is going to redeem out of higher cost debt. Neither is it likely that a corporation, whose main enterprise is the production of electric power, will cease proposed construction and expansion. Given today's ever increasing demand for electrical power, ever greater construction and expansion can be expected.

Thus, plaintiffs' interpretation in effect would render the stock uncallable prior to August 1, 1980. If this were Edison's intent it could have been achieved with a great deal less words. Further, it is not beyond the realm of speculation that a stock issued as uncallable for ten years could have been sold bearing a lesser rate of return than 9.44%.

■ In the construction of a contract an interpretation which gives reasonable meaning to all its terms is preferred to an interpretation which leaves some terms to no effect. *See, Thomas Hoist Co. v. Newman Co.,* 365 Ill. 160, 166, 6 N.E.2d 171 (1937); *Restatement of Contracts,* § 236(a); and *Williston,* Contracts § 619, p. 731 (3rd Ed. 1971). The interpretation sought by plaintiffs would render meager meaning to the price for redemption prior to August 1, 1980 and no meaning to the word "refunding." The objection to Edison's interpretation is that it does not give "anticipation" the broadest possible meaning. Under these circumstances, Edison's interpretation must prevail.

Having reached that conclusion the remaining discussion is perhaps unwarranted but in view of the time and effort expended by the parties and their counsel and in view of the length of the opinion at this point, I would feel remiss if some mention of the other arguments were not made.

Edison argued further, that in the event the redemption terms were found ambiguous, trade usage should be used to interpret those terms. In this regard, Edison offered the expert testimony of Mr. Edward Lebens of the First Boston Corporation, Mr. Sanford Reis of Reis & Chandler, Inc., and Mr. Fergus McDiarmid of Lincoln National Life Insurance Company. Mr. Lebens, as discussed earlier, testified that the language here in question grew out of investor responses to corporate bond rollovers occurring in the 1930's and 40's. All three of plaintiffs' witnesses testified that the language here was never intended to prevent redemption out of common stock and that since common stock was the company's permanent capital it was never issued in anticipation of any further financial activity.

■ Although the veracity of these witnesses is undoubted, this evidence is unpersuasive. The problem with the evidence is determining what "trade" is familiar with these terms and their history. None of the plaintiffs who testified, nor any of plaintiffs' employees, were aware of this trade usage or the history surrounding it. The credentials of many of plaintiffs' witnesses are unsurpassed. Apparently one must have been active in the bond market of the 1930's and 40's to be aware of this trade usage. Further, were the redemption provisions contained in a corporate bond, the expert testimony would be more relevant and more persuasive. But the issue here is preferred stock. The exhibits establish that similar language is not uncommon in preferred stock issues. But the evidence fails to establish that the language had a generally known or well established trade usage among those commonly dealing with preferred stock issues.

Plaintiffs' major argument on the contract issue is that the redemption terms constitute a contract of adhesion and thus any ambiguities must be construed against the drafter. It is generally stated that where there is a standardized contract made between parties of disparate bargaining power, the unconscionable features of that contract are unenforceable as a manner of policy. *Van Gemert, supra,* n. 13 at 1380. *See also, Kessler, Contracts of Adhesion—Some Thoughts About Freedom of Contract,* 43 Colum.L.Rev. 629 (1943).

■ Here, there are a number of factors which I believe make the adhesion contract idea unworkable. Primarily, this is because the provisions of the redemption terms as interpreted by Edison, are not unconscionable. The question here is not whether those terms are unconscionable but which of two interpretations of the language is to be given effect.

■ While the adhesion contract theory is inapplicable, I believe its corollary—*Contra Proferentum*—could be appropriate for application here. *Contra Proferentum* is a rule of contract interpretation which provides that when the words of a contract have been chosen by one party and another merely assents to those words, that fact alone may tip the balance against the party drafting the contract. As noted earlier, that fact situation is present here.

■ Edison makes the point, and I believe it well taken, that the idea of construing a contract against the drafter is not a result oriented rule but rather a rule which provides an answer when all other methods of construction and interpretation still leave the contract ambiguous. *Contra Proferentum* is to be used to ascertain meaning where ambiguities remain and not to achieve a verdict for the nondrafter of the agreement. *See, Hurd v. Illinois Bell Telephone Co.,* 136 F.Supp. 125 (N.D.Ill. 1955), *aff'd,* 234 F.2d 942 (7th Cir. 1956); *Bowler v. Metropolitan Sanitary District of Greater Chicago,* 117 Ill.App.2d 237, 254 N.E.2d 144 (1st Dist. 1969), *and 3 Corbin on Contracts,* § 559 (1964).

Here the rule of interpretation which requires all the terms of the contract to be given meaning establishes the controlling interpretation to be given the redemption terms. There remains no ambiguity to be construed against the drafter.

Although I believe Edison could have avoided this entire matter by making its right express, I cannot say that Edison's drafting, which stated expressly the methods by which redemption was prohibited and impliedly reserved to itself all other methods, violated the Federal Securities Laws or violated plaintiffs' vested contract rights. The decision here has not been quick nor easy. Drafting could have alleviated not only the time and effort spent here but the unrewarded expectations of plaintiffs.

Judgment for defendant on all Counts.