MORGAN STANLEY & CO.,
INCORPORATED, Plaintiff,

v.

ARCHER DANIELS MIDLAND
COMPANY, Defendant.

No. 83 Civ. 5113.

United States District Court,
S.D. New York.

July 29, 1983.

On Motion for Summary Judgment
Aug. 19, 1983.

Cravath, Swaine & Moore, New York City, Paul M. Dodyk, Catherine Flickinger, Frank Barron, Ann Verdon, New York City, for plaintiff.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Robert C. Myers, John M. Friedman, Jr., Michael D. DiGiancomo, Saul P. Morgenstern, New York City, for defendant.

## OPINION

SAND, District Judge.

This action, together with 83–5601 and 83–5604, arises out of the planned redemption of $125 million in 16% Sinking Fund Debentures ("the Debentures") by the defendant ADM Midland Company ("ADM") scheduled to take place on Monday, August 1st, 1983. Morgan Stanley & Company, Inc. ("Morgan Stanley") brings this suit under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, §§ 323(a) and 316(b) of the Trust Indenture Act of 1939, 15 U.S.C. §§ 77www(a), 77ppp(b), and other state and federal laws, alleging that the proposed redemption plan is barred by the terms of the Indenture, the language of the Debentures, and the Debenture Prospectus. Plaintiff contends, in addition, that the failure on the part of ADM to reveal its intention to redeem the Debentures, as well as its belief that such redemption would be lawful under the terms of the Indenture Agreement, amounts to an intentional, manipulative scheme to defraud in violation of federal and state securities and business laws. Morgan Stanley seeks a preliminary injunction enjoining ADM from consummating the redemption as planned, and, after full consideration on the merits, permanent injunctive relief barring the proposed transaction and damages. Both parties have pursued an expedited discovery schedule and now cross-move for summary judgment.

## FACTS

In May, 1981, Archer Daniels issued $125,000,000 of 16% Sinking Fund Debentures due May 15, 2011. The managing underwriters of the Debenture offering were Goldman Sachs & Co., Kidder Peabody & Co., and Merrill Lynch, Pierce, Fenner & Smith, Inc. The Debentures state in relevant part:

The Debentures are subject to redemption upon not less than 30 nor more than 60 days' notice by mail, at any time, in whole or in part, at the election of the Company, at the following optional Re-

demption Price (expressed in percentages of the principal amount), together with accrued interest to the Redemption Date ..., all as provided in the Indenture: If redeemed during the twelve-month period beginning May 15 of the years indicated:

| Year | Percentage | Year | Percentage |
|------|-----------|------|-----------|
| 1981 | 115.500 % | 1991 | 107.750 % |
| 1982 | 114.725 | 1992 | 106.975 |
| 1983 | 113.950 | 1993 | 106.200 |
| 1984 | 113.175 | 1994 | 105.425 |
| 1985 | 112.400 | 1995 | 104.650 |
| 1986 | 111.625 | 1996 | 103.875 |
| 1987 | 110.850 | 1997 | 103.100 |
| 1988 | 110.075 | 1998 | 102.325 |
| 1989 | 109.300 | 1999 | 101.550 |
| 1990 | 108.525 | 2000 | 100.775 |

and thereafter at 100%; provided, however, that prior to May 15, 1991, the Company may not redeem any of the Debentures pursuant to such option from the proceeds, or in anticipation, of the issuance of any indebtedness for money borrowed by or for the account of the Company or any Subsidiary (as defined in the Indenture) or from the proceeds, or in anticipation of a sale and leaseback transaction (as defined in Section 1008 of the Indenture), if, in either case, the interest cost or interest factor applicable thereto (calculated in accordance with generally accepted financial practice) shall be less than 16.08% per annum.

The May 12, 1981 Prospectus and the Indenture pursuant to which the Debentures were issued contain substantially similar language.[1] The Moody's Bond Survey of April 27, 1981, in reviewing its rating of the Debentures, described the redemption provision in the following manner:

> "The 16% sinking fund debentures are nonrefundable with lower cost interest debt before April 15, 1991. Otherwise, they are callable in whole or in part at prices to be determined.

The proceeds of the Debenture offering were applied to the purchase of long-term government securities bearing rates of interest below 16.089%.

ADM raised money through public borrowing at interest rates less than 16.08% on at least two occasions subsequent to the issuance of the Debentures. On May 7, 1982, over a year before the announcement of the planned redemption, ADM borrowed $50,555,500 by the issuance of $400,000,000 face amount zero coupon debentures due 2002 and $100,000,000 face amount zero coupon notes due 1992 (the "Zeroes"). The Zeroes bore an effective interest rate of less

---

1. The May 12, 1981 Prospectus announcing the issuance of the Debentures provides, in relevant part:

> The Sinking Fund Debentures will be subject to redemption, upon not less than 30 nor more than 60 days' notice by mail, (1) on May 15 in any year commencing with the year 1992 and ending with the year 2010 through operation of the sinking fund at a Redemption Price equal to 100% of the principal amount, and (2) at any time, in whole or in part, at the election of the Company, at a Redemption Price equal to the percentage of the principal amount set forth below if redeemed during the twelve-month period beginning May 15 of the years indicated:
>
> \* \* \* \* \* \*
>
> and thereafter at a Redemption Price equal to 100% of the principal amount, together in each case with accrued interest to the Redemption Date, provided, however, that the Company will not be entitled to redeem any of the Sinking Fund Debentures prior to May 15, 1991 as part of a refunding or anticipated refunding operation by the application, directly or indirectly, of the proceeds of indebtedness for money borrowed which shall have an interest cost of less than 16.03% per annum.

The Indenture provides, in relevant part:

> The Debentures may be redeemed, otherwise than through the operation of the sinking fund provided for in Article Twelve, at the election of the Company, as a whole or from time to time in part, at any time, subject to the conditions and at the Redemption Prices specified in the second paragraph on the reverse side of the form of Debenture hereinbefore set forth; provided, however, that prior to May 15, 1991, the Company may not redeem any of the Debentures pursuant to such option from the proceeds, or in anticipation, of the issuance of any indebtedness for money borrowed by or for the account of the Company or any Subsidiary or from the proceeds, or in anticipation, of a sale and leaseback transaction (as defined in Section 1008), if, in either case, the interest cost or interest factor applicable thereto (calculated in accordance with generally accepted financial practice) shall be less than 16.08% per annum.

than 16.08%. On March 10, 1983, ADM raised an additional $86,400,000 by the issuance of $263,232,500 face amount Secured Trust Accrual Receipts, known as "Stars," through a wholly-owned subsidiary, Midland Stars Inc. The Stars carry an effective interest rate of less than 16.08%. The Stars were in the form of notes with varying maturities secured by government securities deposited by ADM with a trustee established for that purpose. There is significant dispute between the parties as to whether the Stars transaction should be treated as an issuance of debt or as a sale of government securities. We assume, for purposes of this motion, that the transaction resulted in the incurring of debt.

In the period since the issuance of the Debentures, ADM also raised money through two common stock offerings. Six million shares of common stock were issued by prospectus dated January 28, 1983, resulting in proceeds of $131,370,000. And by a prospectus supplement dated June 1, 1983, ADM raised an additional $15,450,000 by issuing 600,000 shares of common stock.

Morgan Stanley, the plaintiff in this action, bought $15,518,000 principal amount of the Debentures at $1,252.50 per $1,000 face amount on May 5, 1983, and $500,000 principal amount at $1,200 per $1,000 face amount on May 31, 1983. The next day, June 1, ADM announced that it was calling for the redemption of the 16% Sinking Fund Debentures, effective August 1, 1983. The direct source of funds was to be the two ADM common stock offerings of January and June, 1983. The proceeds of these offerings were delivered to the Indenture Trustee, Morgan Guaranty Trust Company, and deposited in a special account to be applied to the redemption. The amount deposited with the Indenture Trustee is sufficient to fully redeem the Debentures.

Prior to the announcement of the call for redemption, the Debentures were trading at a price in excess of the $1,139.50 call price. At no time prior to the June 1 announcement did ADM indicate in any of its materials filed with the Securities and Exchange Commission or otherwise that it intended to exercise its redemption rights if it felt it was in its self-interest to do so. Nor did it express any contemporaneous opinion as to whether it was entitled under the terms of the Indenture to call the Debentures when it was borrowing funds at an interest rate less than 16.08% if the source of such redemption was other than the issuance of debt.

Plaintiff's allegations can be reduced to two general claims: First, plaintiff contends that the proposed redemption is barred by the express terms of the call provisions of the Debenture and the Indenture Agreement, and that consummation of the plan would violate the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa *et seq.* and common law principles of contract law. The plaintiff's claim is founded on the language contained in the Debenture and Trust Indenture that states that the company may not redeem the Debentures "from the proceeds, or in anticipation, of the issuance of any indebtedness ... if ... the interest cost or interest factor ... [is] less than 16.08% per annum." Plaintiff points to the $86,400,000 raised by the Stars transaction within 90 days of the June 1 redemption announcement, and the $50,555,500 raised by the Zeroes transaction in May, 1982—both at interest rates below 16.08%—as proof that the redemption is being funded, at least indirectly, from the proceeds of borrowing in violation of the Debentures and Indenture agreement. The fact that ADM raised sufficient funds to redeem the Debentures entirely through the issuance of common stock is, according to the plaintiffs, an irrelevant "juggling of funds" used to circumvent the protections afforded investors by the redemption provisions of the Debenture. Plaintiff would have the Court interpret the provision as barring redemption during any period when the issuer has borrowing at a rate lower than that prescribed by the Debentures, regardless of whether the direct source of the funds is the issuance of equity, the sale of assets, or merely cash on hand.

The defendant would have the Court construe the language more narrowly as bar-

ring redemption only where the direct or indirect source of the funds is a debt instrument issued at a rate lower than that it is paying on the outstanding Debentures. Where, as here, the defendant can point directly to a non-debt source of funds (the issuance of common stock), the defendant is of the view that the general redemption schedule applies.

Plaintiff's second claim, brought under federal and state securities laws and state business law, is based on the alleged failure on to the part of ADM to reveal three material facts in any of the documents with the Securities and Exchange Commission or otherwise: (1) that ADM held a "highly restrictive" view of the redemption language that prohibited it from calling the Debentures only where such redemption was funded directly from an account holding the proceeds of a prohibited borrowing; (2) that ADM contemplated redemption when it deemed it to be in ADM's self-interest despite contemporaneous borrowing at rates below 16.08%; and (3) that ADM intended to use the proceeds from sale of the Debentures for speculation in long-term government securities in conjunction with a plan to call the Debentures if and when interest rates dropped. Morgan Stanley contends that the failure to disclose these facts amounted to a deceptive, misleading, and manipulative course of conduct because it fostered what it describes as the prevailing view among investors that ADM could not and would not call its Debentures in the near future.

According to Morgan Stanley, the fact that the Debentures were trading at levels above the call price prior to the redemption announcement bolsters the argument that the investing public thought it was protected against early redemption. The plaintiff asserts that it would not have bought the Debentures without what it perceived to be protection against premature redemption.

ADM contends that plaintiff's allegations of securities fraud stem in the first instance from its strained and erroneous interpretation of the redemption language. Defendant argues that the redemption language itself—a boilerplate provision found in numerous Indenture Agreements—was sufficient disclosure. Moreover, defendant asserts that it had no plan or scheme at the time the Debentures were issued to exercise its call rights in conjunction with speculation in government securities or otherwise and that the provision existed solely to offer the issuer "financial flexibility." More important, defendant contends that its view of the Debenture language was the one commonly accepted by both bondholders and the investing public. In support of this contention, defendant points to the only case directly to address the issue, *Franklin Life Insurance Co. v. Commonwealth Edison Co.*, 451 F.Supp. 602 (S.D.Ill.1978), *aff'd per curiam on the opinion below*, 598 F.2d 1109 (7th Cir.), *rehearing and rehearing en banc denied, id., cert. denied*, 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). *Franklin* held, with respect to language almost identical to that contained in the ADM Debentures, that a redemption directly funded through equity financing was not prohibited despite contemporaneous borrowing by the issuer.

Defendant contends that it first seriously contemplated redemption in the Spring of 1983 upon the suggestion of Merrill Lynch, one of its investment bankers. Merrill Lynch had received legal advice that a redemption transaction of the sort contemplated was proper under the language of the Debenture and the analysis of the Court in *Franklin*. Moreover, the defendant asserts that Morgan Stanley itself was fully aware of this interpretation of the redemption language, although it may have disagreed with it. ADM explains the high price at which the Debentures were trading prior to the redemption announcement not as a reflection of investors' belief that the Debentures were not currently redeemable, but rather as a reflection of the belief that ADM itself, or some other interested buyer, might seek to purchase the Debentures through a tender offer or other financial transaction.

## DISCUSSION

This Circuit will grant preliminary injunctive relief only upon a showing of (a)

irreparable harm *and* (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief. *E.g., Sierra Club v. Hennessy,* 695 F.2d 643, 647 (2d Cir.1982); *Sperry Int'l Trade, Inc. v. Israel,* 670 F.2d 8, 11 (2d Cir.1982). Morgan Stanley fails to satisfy these criteria in all respects.

First, plaintiff has failed to present any facts supporting a contention that money damages would be an inadequate remedy should it prevail in this action. Where money damages are available, there can be no finding of irreparable harm. *E.g., Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

Despite what plaintiff's counsel characterizes as the "monumental importance" of the ultimate ruling in this action, this dispute involves a specific quantity of fixed-term financial debentures bearing interest rates and call prices governed by a detailed Indenture. Given this detailed financial information, we can discern no reason why plaintiff could not, should it prevail on the merits, present expert testimony on the present value of debentures with similar characteristics or such other financial data necessary to calculate an income stream comparable to the redeemed Debentures. The ADM Debentures are traded nationally and while the market is rather limited, there appears to be no impediment to introducing historical data on market trends in these or similar securities for purposes of ascertaining damages. Moreover, should this task prove too difficult or imprecise, it is within the power of the Court to order ADM to reissue Debentures for the same term containing the same interest rates, as counsel for ADM conceded at oral argument.

Plaintiff's assertion that the Debentures are somehow "unique" financial instruments for which there are no comparable substitutes is unconvincing. This argument is based on two propositions: first, that the ADM Debentures are "A" rated long-term bonds issued by a financially sound company that pay a high rate of interest. Second, that the present value of the future income stream yielded by the Debentures is a function of each bondholder's subjective perceptions of the market and is therefore not capable of quantification.

The fact that the Debentures are "A" rated and pay a high rate of interest over a significant period of time does not in any sense make them unique. The record reveals a number of financial instruments that are arguably comparable to the ADM Debentures with respect to interest rate, maturity and risk. To be sure, bonds of superior quality may very well be hard to come by in today's market. Nevertheless, this fact does not prove they are unique, but merely that they represent an excellent investment; should plaintiff prevail, its damages would accordingly be greater than they might be were the bonds of a lesser quality.

Plaintiff's second argument is equally unconvincing. Indeed, were the Court to accept the proposition that these Debentures were unique because of the varying subjective evaluations of the individual bondholders, we would be hard pressed to deny preliminary relief in any securities case on the grounds of a failure to show irreparable harm.

Regardless of the strength of plaintiff's claims on the merits, the lack of a colorable showing of irreparable harm would require the denial of preliminary relief on this basis alone. Even if we were to assume, *arguendo,* that Morgan Stanley had made out a claim for irreparable harm, it has failed to meet the additional criteria necessary for the issuance of a preliminary injunction.

With respect to the likelihood of success on the merits, defendant's interpretation of the redemption provision seems at least as likely to be in accord with the language of the Debentures, the Indenture, and the available authorities than is the view proffered by the plaintiff. We first note that the one court to directly address this issue chose to construe the language in the manner set forth in this action by the defend-

ant. *Franklin Life Insurance Co. v. Commonwealth Edison Co.,* 451 F.Supp. 602 (S.D.Ill.1978), *aff'd per curiam on the opinion below,* 598 F.2d 1109 (7th Cir.), *rehearing and rehearing en banc denied, id., cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). While plaintiff is correct in noting that this Circuit is not bound by this decision, and while this case can no doubt be distinguished factually on a number of grounds, none of which we deem to be of major significance, *Franklin* is nevertheless persuasive authority in support of defendant's position.

Defendant's view of the redemption language is also arguably supported by The American Bar Foundation's Commentaries on Model Debenture Indenture Provisions (1977), from which the boilerplate language in question was apparently taken verbatim. In discussing the various types of available redemption provisions, the Commentaries state:

> [I]nstead of an absolute restriction [on redemption], the parties may agree that the borrower may not redeem with funds borrowed at an interest rate lower than the interest rate in the debentures. *Such an arrangement recognizes that funds for redemption may become available from other than borrowing,* but correspondingly recognizes that the debenture holder is entitled to be protected for a while against redemption if interest rates fall and the borrower can borrow funds at a lower rate to pay off the debentures.

*Id.* at 477 (emphasis added). We read this comment as pointing to the *source* of funds as the dispositive factor in determining the availability of redemption to the issuer—the position advanced by defendant ADM.

Finally, we view the redemption language itself as supporting defendant's position. The redemption provision in the Indenture and the Debentures begins with the broad statement that the Debentures are "subject to redemption ... at any time, in whole or in part, at the election of the company, at the following optional Redemption Price...." Following this language is a table of decreasing redemption percent-ages keyed to the year in which the redemption occurs. This broad language is then followed by the narrowing provision "provided, however ... the Company may not redeem any of the Debentures pursuant to such option from the proceeds, or in anticipation, of the issuance of any indebtedness" borrowed at rates less than that paid on the Debentures.

While the "plain meaning" of this language is not entirely clear with respect to the question presented in this case, we think the restrictive phrasing of the redemption provision, together with its placement after broad language allowing redemption in all other cases at the election of the company, supports defendant's more restrictive reading.

Morgan Stanley asserts that defendant's view would afford bondholders no protection against redemption through lower-cost borrowing and would result in great uncertainty among holders of bonds containing similar provisions. In its view, the "plain meaning" of the redemption bondholders of these bonds and the investment community generally, is that the issuer may not redeem when it is contemporaneously engaging in lower-cost borrowing, regardless of the source of the funds for redemption. At the same time, however, the plaintiff does not contend that redemption through equity funding is prohibited for the life of the redemption restriction once the issuer borrows funds at a lower interest rate subsequent to the Debenture's issuance. On the contrary, plaintiff concedes that the legality of the redemption transaction would depend on a factual inquiry into the magnitude of the borrowing relative to the size of the contemplated equity-funded redemption and its proximity in time relative to the date the redemption was to take place. Thus, a $100 million redemption two years after a $1 million short-term debt issue might be allowable, while the same redemption six months after a $20 million long-term debt issue might not be allowable.

This case-by-case approach is problematic in a number of respects. First, it appears keyed to the subjective expectations of the

bondholders; if it *appears* that the redemption is funded through lower-cost borrowing, based on the Company's recent or prospective borrowing history, the redemption is deemed unlawful. The approach thus reads a subjective element into what presumably should be an objective determination based on the language appearing in the bond agreement. Second, and most important, this approach would likely cause greater uncertainty among bondholders than a strict "source" rule such as that adopted in *Franklin, supra.*

Plaintiff's fear that bondholders would be left "unprotected" by adoption of the "source" rule also appears rather overstated. The rule proposed by defendant does not, as plaintiff suggests, entail a virtual emasculation of the refunding restrictions. An issuer contemplating redemption would still be required to fund such redemption from a source other than lower-cost borrowing, such as reserves, the sale of assets, or the proceeds of a common stock issue. Bondholders would thus be protected against the type of continuous short-term refunding of debt in times of plummeting interest rates that the language was apparently intended to prohibit. *See Franklin, supra,* 451 F.Supp. at 609. Moreover, this is not an instance where protections against premature redemption are wholly absent from the Debenture. On the contrary, the Debentures and the Indenture explicitly provide for early redemption expressed in declining percentages of the principal amount, depending on the year the redemption is effected.

At this early stage of the proceedings, on the record before us, and for all the reasons outlined above, we find that plaintiff has failed to show a sufficient likelihood of its success on the merits of its contract claims as to entitle it to preliminary injunctive relief.

For many of the same reasons, we also find that plaintiff has failed to show a likelihood of success on its federal and state securities and business law claims. In order to prevail on a claim of securities fraud under § 10(b) of the Securities Act of 1934 and Rule 10b–5 issued thereunder, the plaintiff must prove, *inter alia,* that the defendant made a material misstatement or nondisclosure, or engaged in a manipulative and deceptive course of conduct, and that the defendant acted with scienter. The requirements for a claim under § 17(a) of the Securities Act of 1933 with respect to these elements are, for purposes of this motion, the same as those under § 10(b), except that in certain cases the plaintiff may need only prove negligence. We find the evidence in the record insufficient to establish a likelihood of success with respect to both of these requirements.

ADM disclosed the redemption language both in its Prospectus and in the Indenture. It also disclosed that the proceeds of the Debenture issue would be "invested in long-term or short-term marketable securities and used to repay short-term borrowings incurred in part to purchase long-term marketable securities." These disclosures appear perfectly consistent with the purchase of long-term government securities with Debenture proceeds, and would, at first blush, appear to be adequate. To add force to its claims, plaintiff would have to establish that, at the time the securities were issued, plaintiff contemplated redeeming the Debentures at an early date in conjunction with liquidation of its government securities as part of an overall investment scheme. Were this the case, it is arguable that the failure to reveal this information misled investors as to the increased likelihood of early redemption.

Plaintiff's strongest evidence in support of this claim is that the investment of the proceeds of the Debenture issue in United States Treasury Bills that paid an interest rate lower than 16.08% made no economic sense except as part of an overall scheme to engage in short-term speculation. While plaintiff's claim in this regard finds some support in the evidence, it also requires the fact-finder to engage in considerable theorizing from the prospective of hindsight. It appears just as likely, based on our review of the record, that ADM did not contemplate early redemption when the Deben-

tures were issued, and that the proceeds of the Debentures were invested in government securities simply as an interim holding until such time as ADM decided to employ such funds for other corporate purposes. The failure specifically to disclose that the proceeds of the Debentures were to be used to purchase long-term government bonds as a hedge against falling interest rates does not, in and of itself, provide a strong securities claim.

The second basis of Morgan Stanley's securities claim—that ADM failed to reveal its "restrictive" view of the redemption language—also suffers from serious problems, at least with respect to the alleged failure to disclose such view at the time the Debentures were first issued. In order for Morgan Stanley to prevail on this claim, it would have to show that the interpretation of the provision urged by the defendant was contrary to that prevailing in the investment community when the Debentures were issued. Plaintiff's main evidence on this point is the affidavit testimony of a number of Morgan Stanley employees and other bondholders, presumably representing the informed view of the investment community, stating their opinion that redemption is prohibited where a company engages in contemporaneous lower-cost borrowing. An equally plausible interpretation, and indeed the view supported by plaintiff's own affidavits, is that few investors had ever seriously considered the legal ramifications of redemption under the circumstances faced by ADM. Indeed, the record reveals a clear awareness on the part of institutional professionals that the right to redemption from the proceeds of a stock issue was very much an open question and that therefore there was a likelihood that an aggressive company in a position similar to that of ADM would attempt to call its bonds under just such circumstances. One bond salesman for Morgan Stanley candidly stated:

> Quite frankly . . . the question whether a court would ultimately find that a call was lawful or unlawful was largely irrelevant to my view of the economic risks for bondholders if any corporation announced a call. . . .

> No portfolio manager with whom I have dealt has ever expressed to me a view, *one way or the other,* as to whether a call by [Archer Daniels] of the Debentures would violate the nonrefunding provisions that govern the Debentures. As far as I know, no institution that I deal with has ever considered the question.

Deposition of Frederic W. Levin, Affidavit of Catherine R. Flickinger, Ex. B. See also Affidavit of Joseph W. Hill, Flickinger Aff., Ex. C.

Given evidence of these views, Morgan Stanley will have some difficulty maintaining that ADM's interpretation of the redemption provision "drastically changed the plain meaning on which investors relied." Plaintiff's Memorandum in Support, at 17. Moreover, defendant plausibly explains the high price at which Archer Debentures were trading prior to the redemption announcement as reflecting anticipation of a likely tender offer. Even were this not the case, one would presume that 16% Debentures would trade at a price at least somewhat in excess of the call price during times of lower interest rates unless the possibility of redemption was near to certain. The market price at which ADM Debentures were trading was no doubt more reflective of the investment community's perception of what ADM might do than it was of what ADM had the legal right to do.

The view more readily supported by the facts in this record is that ADM revealed all the facts that were required with respect to its rights under the redemption provision and that, indeed, the untested downside risk of the redemption provision had been fully taken into account in evaluating the market value of ADM's securities. On these facts we cannot say that plaintiff has shown a likelihood of showing both a material misstatement or omission and the level of intent necessary to constitute a violation of federal and state securities laws.

Plaintiff's strongest claims, and those most readily supported by the evidence, are that ADM failed to make adequate disclosure with respect to the Stars transaction

and its most recent issues of common stock. In addition, a relatively strong argument could be made that, at some point subsequent to these transactions, after ADM began seriously considering an early redemption of its Debentures, and in light of its knowledge of the prevailing market price of the Debentures, plaintiff's failure to disclose its interpretation of the redemption provision amounted to a negligent or reckless material omission. Nevertheless, in light of the evidence presented in support of plaintiff's other securities and business law claims, and viewing the complaint in its entirety, we find that the plaintiff has failed to show a likelihood of success on the merits.

We turn, finally, to the second, alternative prong of the requirement for preliminary relief. While plaintiff has doubtless presented serious questions going to the merits making a fair ground for litigation, it has made no showing of a balance of hardships tipping decidedly in its favor. Moreover, in this regard, we find quite persuasive the comments of counsel for Morgan Guaranty, the Indenture Trustee. While expressing no position on the merits, counsel urged that the hardships that would result in the event we were to grant preliminary relief at this late date would be incalculable to bondholders other than the plaintiff who already may have made firm business commitments in anticipation of receipt of the redemption funds as of August 1. In this regard, defendant has agreed to treat all bondholders equally after a trial on the merits or other dispositive motions. Defendant has further agreed that it will not contend that there is a waiver of any rights on the part of any of bondholder who cash-

es checks issued pursuant to this redemption.

For all of the above reasons, and on the record now before us, plaintiff's application for preliminary injunctive relief is hereby denied.

Decision on the parties' cross-motions for summary judgment is reserved.

SO ORDERED.

## ON MOTION FOR SUMMARY JUDGMENT

SAND, District Judge.

On July 29, 1983, this Court denied the application of plaintiff Morgan Stanley & Co., Inc. ("Morgan Stanley") for preliminary injunctive relief, reserving decision on the parties' cross-motions for summary judgment. After a thorough review of the record, for the reasons stated in our prior Opinion, and for the reasons stated below, we now grant the motion of defendant Archer Daniels Midland Company ("ADM") for partial summary judgment on the contract claims (Counts VI, X–XII), and deny Morgan Stanley's motion for summary judgment on the federal and state securities and business law claims. We assume familiarity with the facts of this case as set forth in our prior Opinion denying preliminary relief.

*Contract Claims*

The plaintiff's contract claims arise out of alleged violations of state contract law.[1] Section 113 of the Indenture provides that the Indenture and the Debentures shall be governed by New York law. Under New York law, the terms of the Debentures constitute a contract between ADM and the holders of the Debentures,

---

1. Because plaintiff's pendent contract claims are properly before us, *see United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), we need not decide whether an independent federal cause of action exists under the Trust Indenture Act of 1939 for breach of a *nonmandated* provision of the Indenture. *Compare Zeffiro v. First Pennsylvania Banking and Trust Co.*, 623 F.2d 290 (3d Cir.1980), *cert. denied*, 456 U.S. 1005, 102 S.Ct. 2295, 73 L.Ed.2d 1299

(1982) (private right of action for breach of indenture provisions *mandated* by the Act). In any event, a finding that the defendant breached § 316(b) of the Act, which guarantees the right to payment of principal and interest, would, in this case, require a precedent finding that the nonmandated redemption provision was violated under applicable state law—the very question we address with respect to plaintiff's pendent contract claims.

including Morgan Stanley. *See Friedman v. Airlift International, Inc.,* 44 A.D.2d 459, 355 N.Y.S.2d 613 (1st Dep't 1974); *Van Gemert v. Boeing Co.,* 520 F.2d 1373, 1383 (2d Cir.), *cert. denied,* 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), *appeal after remand,* 553 F.2d 812, 813 (2d Cir.1977) (applying New York law). The relevant contract terms are printed on the Debentures and, by incorporation, in the Indenture.[2]

We note as an initial matter that where, as here, the contract language in dispute is a "boilerplate" provision found in numerous debentures and indenture agreements, the desire to give such language a consistent, uniform interpretation requires that the Court construe the language as a matter of law. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048–49 (2d Cir.1982) (applying New York law), *cert. denied,* —— U.S. ——, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983); *cf. Broad v. Rockwell International Corp.,* 642 F.2d 929, 946–48 (5th Cir.) (en banc) (applying New York law), (interpretation of unambiguous contract provision is function for the court rather than the jury) *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981).

In *Franklin Life Insurance Co. v. Commonwealth Edison Co.,* 451 F.Supp. 602 (S.D.Ill.1978), *aff'd per curiam on the opinion below,* 598 F.2d 1109 (7th Cir.), *rehearing and rehearing en banc denied, id., cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979), the district court found, with respect to language nearly identical to that now before us, that an early redemption of preferred stock was lawful where funded directly from the proceeds of a common stock offering.

Morgan Stanley argues, however, that *Franklin* was incorrectly decided and should therefore be limited to its facts. We find any attempt to distinguish *Franklin* on its facts to be wholly unpersuasive. Commonwealth Edison, the defendant in *Franklin,* issued 9.44% Cumulative Preferred Stock in 1970. The stock agreement contained a redemption provision virtually identical to that at issue in this litigation.[3] The prospectus announcing the preferred stock would be used primarily for interim financing of a long-term construction program. The construction program required an estimated expenditure of approximately $2,250,000,000, of which $1,150,000,000 would have to be raised through the sale of additional securities of the company. *Franklin, supra,* 451 F.Supp. at 605. In accord with this estimate, Commonwealth Edison's long-term debt increased from $1.849 billion at the end of 1971 to an amount in excess of $3 billion by the time of trial in 1978. All of this debt was issued at interest rates below 9.44%. In January of 1972, Commonwealth Edison announced its intention to redeem the preferred stock with the proceeds of a common stock issue.

2. ADM argues that, because Morgan Stanley holds less than 25% of the outstanding Debentures, it has no standing under § 507(2) of the Indenture to maintain its contract claims. Section 507(2) provides that no Debenture holder shall have the right to institute suit with respect to the Indenture unless the holders of not less than 25% of the outstanding Debentures first request the Trustee to institute proceedings in its own name. Such limitations on the rights of bondholders to seek legal relief are not enforceable, however, where the face of the bond does not give adequate notice of the restriction. *Friedman v. Airlift International, Inc.,* 44 A.D.2d 459, 355 N.Y.S.2d 613 (1st Dep't 1974). The ADM Debentures do not explicitly mention the restrictions contained in § 507. In any event, we view the interven-tion in this action by the Indenture Trustee, Morgan Guaranty, as a waiver of § 507 to the extent applicable.

3. The redemption provision contained in the preferred stock agreement provided that none of the stock:
... may be redeemed through refunding, directly or indirectly, by or in anticipation of the incurring of any debt or the issuance of any shares of the Prior Preferred Stock or any other stock ranking prior to or on a' parity with the Prior Preferred Stock, if such debt had an interest cost to the Company (as defined) or such shares have a dividend cost to the Company of the 9.44% Prior Preferred Stock.
*Franklin Life Insurance Co. v. Commonwealth Edison Co., supra,* 451 F.Supp. at 613.

The Franklin Life Insurance Company brought suit, contending that the language of the redemption provision barred redemption where Commonwealth Edison had been borrowing at interest rates below 9.44%, and expected to continue borrowing at such rates in the near future. The district court rejected plaintiff's claims, and held that the redemption was lawful because the refunding was accomplished solely from the proceeds of the common stock issue. In adopting a rule that looked to the source of the proceeds for redemption, the court rejected a "net borrower" theory that would have examined the issuer's general corporate borrowing history. Thus, Edison's borrowing projections and the sizable anticipated increase in its long-term, lower-cost debt was irrelevant, given that the undisputed source of the redemption was the common stock issue.

According to Morgan Stanley, the *Franklin* court was forced to give this "strained" interpretation to the redemption provision "in order to permit Commonwealth Edison to continue its ongoing capital construction program and at the same time give the redemption provision some meaning." Plaintiff's Reply Memorandum, at 5–6. Because ADM has no similar long-term construction program, Morgan Stanley contends that this Court need not accord ADM the same rights as were provided Commonwealth Edison in *Franklin.*

We disagree. There is no indication in *Franklin* that the court's decision was mandated in any sense by Commonwealth Edison's ongoing, large-scale construction program. Had the *Franklin* court found the redemption unlawful, the result would not have forced termination of Edison's construction program, but merely would have barred redemption of its preferred stock—the same result that would occur were we to declare ADM's redemption unlawful. Morgan Stanley points out, however, that ADM has a choice that was unavailable to Commonwealth Edison: "[I]t [ADM] can issue debt at interest rates lower than 16.08% and not redeem the Debentures, or it can redeem the Debentures and not issue other, lower-interest debt. The latter op-

tion was not available to Commonwealth Edison." Plaintiff's Reply Memorandum, at 6. Plaintiff is correct that the latter option was not available to Commonwealth Edison; but the former option was available, just as it is in this action. There is simply no factual basis in *Franklin* from which to infer that Commonwealth Edison would have abandoned its construction program had it been forced to carry its preferred stock to maturity.

Morgan Stanley contends nevertheless that *Franklin* was wrongly decided, as a matter of law, and that a fresh examination of the redemption language in light of the applicable New York cases would lead us to reject the "source" rule. In this regard, Morgan Stanley suggests a number of universal axioms of contract construction intended to guide us in construing the redemption language as a matter of first impression. For example, Morgan counsels that we should construe the contract terms in light of their "plain meaning," and should adopt the interpretation that best accords with all the terms of the contract. *Prescott, Ball & Turben v. LTV Corp.,* 531 F.Supp. 213, 218 (S.D.N.Y.1981) (applying New York law); *Broad v. Rockwell International Corp., supra,* 642 F.2d at 947 (applying New York law). Words are not to be construed as meaningless if they can be made significant by a reasonable construction of the contract. *67 Wall Street Co. v. Franklin National Bank,* 37 N.Y.2d 245, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975). Where several constructions are possible, the court may look to the surrounding facts and circumstances to determine the intent of the parties. *Id.* Finally, Morgan Stanley urges that all ambiguities should be resolved against the party that drafted the agreement. *67 Wall Street Co. v. Franklin National Bank, supra; Prescott, Ball & Turben v. LTV Corp., supra,* 531 F.Supp. at 217.

We find these well-accepted and universal principles of contract construction singularly unhelpful in construing the contract language before us. Several factors lead us to this conclusion. First, there is simply no

"plain meaning" suggested by the redemption language that would imbue all the contract terms with a significant meaning. Either party's interpretation of the redemption language would dilute the meaning of at least some of the words—either the "indirectly or directly," "in anticipation of" language, were we to adopt defendant's "source" rule, or the "from the proceeds," "as part of a refunding operation" language, were we to adopt the plaintiff's interpretation. Any attempt to divine the "plain meaning" of the redemption language would be disingenuous at best.

Equally fruitless would be an effort to discern the "intent of the parties" under the facts of this case. It may very well be that ADM rejected an absolute no-call provision in its negotiations with the underwriters in favor of language it viewed as providing "greater flexibility." It is also clear, however, that neither the underwriters nor ADM knew whether such "flexibility" encompassed redemption under the facts of this case. The deposition testimony of ADM officials suggesting that they believed at the time they negotiated the Indenture that they could redeem the Debentures at any time except through lower-cost debt merely begs the question. Had ADM management so clearly intended the Indenture to allow refunding under the circumstances of this case, it surely would have considered that option prior to the suggestions of Merrill Lynch, which appears to represent the first time the idea of early redemption funded directly by the proceeds of a stock issue was presented by any of ADM's investment advisors.

Finally, we view this as a most inappropriate case to construe ambiguous contract language against the drafter. The Indenture was negotiated by sophisticated bond counsel on both sides of the bargaining table. There is no suggestion of disparate bargaining power in the drafting of the Indenture, nor could there be. Moreover, even if we were to adopt this rule, it is not at all clear that ADM would be considered the drafter of the Indenture, given the active participation of the managing underwriter. Indeed, it is arguable that the am-

biguous language should be construed in favor of ADM. *See Broad v. Rockwell International Corp., supra,* 642 F.2d at 947 n. 20 (purchaser of Debentures may stand in the shoes of the underwriters that originally negotiated and drafted the debentures).

Not only do the rules of contract construction provide little aid on the facts before us, but we find the equities in this action to be more or less in equilibrium. Morgan Stanley now argues, no doubt in good faith, that the redemption is unlawful under the Indenture. Nevertheless, as we noted in our prior opinion, Morgan Stanley employees were fully aware of the uncertain legal status of an early call at the time they purchased the ADM Debentures. To speak of upsetting Morgan's "settled expectations" would thus be rather misleading under the circumstances. By the same token, however, it is also clear that ADM had no expectations with respect to the availability of an early redemption call until the idea was first suggested by Merrill Lynch.

■ Because we find equitable rules of contract construction so unhelpful on the facts of this case, the decision in *Franklin* takes on added importance. While it is no doubt true that the decision in that case was a difficult one and in no sense compelled under existing law, we find the reasoning of the court thoroughly convincing given the obvious ambiguity of the language it was asked to construe. We also find the result to be a fair one, primarily for the reasons stated in our prior Opinion denying preliminary relief. Moreover, we note that the decision in *Franklin* preceded the drafting of the ADM Indenture by several years. We must assume, therefore, that the decision was readily available to bond counsel for all parties. That the parties may not in fact have been aware of the decision at the time the Indenture was negotiated is not dispositive, for the law in force at the time a contract is entered into becomes a part of the contract. *Skandia America Reinsurance Corp. v. Schenck,* 441 F.Supp. 715, 724 (S.D.N.Y.1977) (applying New York law) ("It is presumed that the

parties had [the relevant] law in contemplation when the contract was made, and the contract must be construed in that light.") (citing *Dolman v. United States Trust Co.,* 2 N.Y.2d 110, 116, 157 N.Y.S.2d 537, 541–42, 138 N.E.2d 784, 788–89 (1956). While *Franklin* was decided under Illinois law and is therefore not binding on the New York courts, we cannot ignore the fact that it was the single existing authority on this issue, and was decided on the basis of universal contract principles. Under these circumstances, it was predictable that *Franklin* would affect any subsequent decision under New York law. *Franklin* thus adds an unavoidable gloss to any interpretation of the redemption language.

■ Finally, we note that to cast aside the holding in *Franklin* would, in effect, result in the very situation the Second Circuit sought to avoid in *Sharon Steel, supra.* In that case, the Court warned that allowing juries to construe boilerplate language as they saw fit would likely result in intolerable uncertainty in the capital markets. To avoid such an outcome, the Court found that the interpretation of boilerplate should be left to the Court as a matter of law. *Sharon Steel, supra,* 691 F.2d at 1048. While the Court in *Sharon Steel* was addressing the issue of varying interpretations by juries rather than by the courts, this distinction does not diminish the uncertainty that would result were we to reject the holding in *Franklin.* Given the paramount interest in uniformly construing boilerplate provisions, and for all the other reasons stated above and in our prior Opinion, we chose to follow the holding in *Franklin.*[4]

Accordingly, we find that the ADM redemption was lawful under the terms of the Debentures and the Indenture, and that therefore defendant's motion for summary judgment on Counts VI and X through XII is hereby granted.

*Securities Claims*

■ For the reasons stated in our Opinion denying preliminary relief, we find that the plaintiff has failed to show an absence of genuine issues of material fact entitling it to judgment as a matter of law. Disputed issues of fact remain with respect to ADM's intent to redeem the Debentures prior to the call date, ADM's interpretation of the breadth of the redemption language at the time the Indenture was negotiated, and ADM's purpose in investing the proceeds of the Debenture issue in long-term government bonds. On this record, we cannot say that the plaintiff has conclusively established both omission of material facts

---

4. We note in this regard that the "source" rule adopted in *Franklin* in no sense constitutes a license to violate the refunding provision. The court is still required to make a finding of the true source of the proceeds for redemption. Where the facts indicate that the proposed redemption was indirectly funded by the proceeds of anticipated debt borrowed at a prohibited interest rate, such redemption would be barred regardless of the name of the account from which the funds were withdrawn. Thus, a different case would be before us if ADM, contemporaneously with the redemption, issued new, lower-cost debt and used the proceeds of such debt to repurchase the stock issued in the first instance to finance the original redemption. On those facts, the redemption could arguably be said to have been indirectly funded through the proceeds of anticipated lower-cost debt, since ADM would be in virtually the same financial posture after the transaction as it was before the redemption—except that the new debt would be carried at a lower interest rate. Here, by contrast, there is no allegation that ADM intends to repurchase the common stock it issued to fund the redemption. The issuance of stock, with its concomitant effect on the company's debt/equity ratio, is exactly the type of substantive financial transaction the proceeds of which may be used for early redemption.

Moreover, we fail to see how, on the facts of this case, the redemption could be argued to be a refunding from the proceeds of lower-cost debt. The Zeroes transaction occurred over a year before the redemption and appears completely unrelated to it. The proceeds of that transaction were used to purchase government securities that remain in ADM's portfolio. The Stars transaction, while closer in time, similarly is not fairly viewed as the source of the redemption, given that the proceeds of that transaction were applied directly to reducing ADM's short-term debt. To view the redemption as having been funded *indirectly* "from the proceeds" of the Stars transaction would require us to ignore the *direct* source of the refunding, the two ADM common stock issues.

and that degree of scienter sufficient to grant summary judgment.

SO ORDERED.